UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MARK A. SWIFT,

                              Plaintiff,

                                                                                 DECISION AND ORDER

                                                                                05-CV-6233L

                            v.

SHERIFF RICHARD C. TWEDDELL, et al.,

                              Defendants.
_____

Plaintiff, Mark Swift, appearing *pro se*, commenced this action pursuant to 42 U.S.C. § 1983. Plaintiff, an inmate in the custody of the New York State Department of Correctional Services ("DOCS") alleges that defendants violated his rights under the United States Constitution in a number of respects during 2004 and 2005, while plaintiff was a pretrial detainee confined at the Steuben County Jail ("jail"). Defendants include a number of sheriff's deputies and jail employees.

Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff has not responded to the motion. For the reasons that follow, the motion is granted.

## DISCUSSION

**I. Plaintiff's Failure to Respond to the Summary Judgment Motion**

Rule 56(e) of the Federal Rules of Civil Procedure provides that

[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's

> pleading, but the adverse party's response by affidavits or as otherwise provided in this rule must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

In addition, Local Rule of Civil Procedure 56(c) provides that "[a]ll material facts set forth in the statement [of undisputed material facts] required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."

The Court of Appeals for the Second Circuit has held that when a party moves for summary judgment against a *pro se* litigant, either the movant or the district court must provide the *pro se* litigant with notice of the consequences of failing to respond to the motion. *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620 (2d Cir. 1999); *see also Irby v. New York City Transit Auth.*, 262 F.3d 412, 413 (2d Cir. 2001).

In the instant case, defendants' notice of motion clearly gave plaintiff notice of the requirements of Rule 56 and the consequences of failing to respond properly to a motion of summary judgment. *See* Dkt. #45-2. The notice stated, *inter alia*, "THE CLAIMS PLAINTIFF ASSERTS IN HIS COMPLAINT MAY BE DISMISSED WITHOUT A TRIAL IF HE DOES NOT RESPOND TO THIS MOTION by filing his own sworn affidavits or other papers as required by Rule 56(e)." The notice went on to explain in some detail the types of materials that plaintiff could submit in opposition to the motion, and warned that if plaintiff did not respond, the Court would accept the truth of defendants' statement of material facts not in dispute. *Id.*

It is also clear that plaintiff received a copy of defendants' motion; in a motion dated June 25, 2007, and filed with the Court on June 27, 2007, plaintiff asked for an extension of time to

respond to defendants' motion. Dkt. #46. The Court granted plaintiff's request on July 5, 2007, and gave plaintiff until July 30, 2007 to submit a response, which, as stated, he failed to do. Dkt. #47.

There is no question, then, that plaintiff has been adequately advised of the pendency of the summary judgment motion, of the need for him to respond and the form in which he should do so, and of the consequences of not responding to defendants' arguments and factual allegations. Since plaintiff has not done so, the Court may accept the truth of defendants' factual allegations, and determine whether, based on those undisputed facts, defendants are entitled to summary judgment. *See Champion v. Ortiz*, 76 F.3d 483, 486 (2d Cir. 1996) (fact that there has been no response to a summary judgment motion does not mean that the motion is to be granted automatically; "Such a motion may properly be granted only if the facts as to which there is no genuine dispute 'show that the moving party is entitled to a judgment as a matter of law'") (citing Fed. R. Civ. P. 56(c)).

**II. Merits of Plaintiff's Claims**

**A. First Claim**

On January 15, 2005, defendant Deputy Fanzo issued an incident report (Dkt. #1-2 at 22) charging plaintiff with five infractions arising out of an altercation between plaintiff and another inmate, including disruptive conduct, fighting, and other charges. A hearing was held before New York State Correction Officer Scott Rodbourn, who found plaintiff not guilty of fighting, but guilty of the other four charges. Plaintiff, who at that point had served nine days in disciplinary segregation (which involves a loss of certain privileges and which in the jail was commonly referred to as

"double lock") on the charges, was sentenced by Rodbourn to an additional twelve days. *See* Defendants' Rule 56 Statement (Dkt. #45-4).

Plaintiff's first claim in this action alleges a due process violation in connection with the hearing before Rodbourn. Specifically, he alleges that Rodbourn "did not ask [plaintiff] what happened" in the incident with the other inmate, and that Rodbourn denied plaintiff's request to call a witness (who is not identified in the complaint). Complaint (Dkt. #1-1) at 10.

At his deposition, plaintiff testified that virtually as soon as plaintiff walked into the hearing room, Rodbourn stated that he "was going to give [plaintiff] the same thing [*i.e.*, the same sentence] that he gave" to the other inmate. Plaintiff's Deposition Transcript ("Tr."), Dkt. #45-10, at 39.[1] Plaintiff also testified, "He didn't ask me. I had witnesses. I had two witnesses to call to verify ... what happened there and [Rodbourn said] it wasn't relevant." *Id.* at 39.

This claim must be dismissed on a number of grounds. First, the punishment imposed–twenty-one days of "double lock," including the nine days that plaintiff spend in double lock prior to the hearing–was not of sufficient length to implicate due process concerns, and there are no allegations, nor is there any evidence, that the conditions under which plaintiff served that sentence were unusually harsh. *See Sandin v. Conner,* 515 U.S. 472, 483-84(1995); *Livingston v. Kelly*, 561 F.Supp.2d 329, 332 (W.D.N.Y. 2008); *see also Pettus v. McGinnis*, 533 F.Supp.2d 337, 341 (W.D.N.Y. 2008) (thirty days in keeplock, absent unusual or severe living conditions, did not give rise to due process claim based on issuance of allegedly false misbehavior report).

---

[1]Page references for the deposition transcript are to the document as electronically filed with this Court, rather than to the original transcript.

Furthermore, plaintiff's allegations about what happened at the hearing are not supported by the evidence. Defendants assert in their Rule 56 statement (the truth of which the Court accepts, as explained above) that plaintiff "was given an opportunity to explain his behavior and mitigating circumstances," that plaintiff admitted being involved in the altercation, and that plaintiff did not ask for any witnesses. Dkt. #45-4 ¶¶ 5, 9. The hearing log likewise reflects that plaintiff gave his explanation of the charges against him, to the effect that Fanzo overreacted to what was nothing more than an argument between plaintiff and the other inmate. Dkt. #45-23 at 4. Rodbourn also states in his unrebutted affidavit that he gave plaintiff an opportunity to testify, and that although plaintiff indicated that there were eyewitnesses to the incident, he did not ask to call anyone in particular as a witness. Dkt. #45-16 ¶ 8.

It appears, then, that plaintiff did testify. If, as plaintiff alleges, Rodbourn summarily reached his decision on the charges without even hearing plaintiff's side of the story, it is certainly difficult to see why Rodbourn would have found plaintiff *not* guilty of the fighting charge.

With respect to the alleged denial of plaintiff's request to call one or more witnesses, again, plaintiff has not submitted any response to defendants' evidence that plaintiff did not in fact request that any witnesses be called. The Court therefore accepts the truth of defendants' assertion in that regard. In any event, plaintiff has not identified in this lawsuit any individuals whom he sought to call, nor has he provided any basis for knowing what their testimony was likely to have been. *See Grossman v. Bruce*, 447 F.3d 801, 804 n.1 (10th Cir. 2006) (stating that inmate plaintiff "makes conclusory statements that he was improperly denied the right to present evidence and that one or more other witnesses were not called at his disciplinary hearing," but that "[h]e does not identify any

of these other witnesses in his appellate brief, nor does he explain what evidence he was unable to introduce, making it impossible to review this claim").

In addition, in his complaint and at his deposition, plaintiff has alleged that Rodbourn declined to call plaintiff's requested witnesses on the ground that they were "not relevant," Dkt. #1-1 at 10, Tr. at 39. Even assuming that plaintiff did request that witnesses be called, there has been no showing that Rodbourn's decision in that regard was unreasonable, much less that it violated plaintiff's due process rights. *See Feliciano v. Selsky*, 205 F.3d 568, 570 (2d Cir. 2000) (referring to "the general rule in this circuit that prison hearing officers have the discretion to keep disciplinary hearings within reasonable limits and that this discretion includes the power to refuse to call witnesses whose testimony may reasonably be regarded as non-probative or duplicative"); *Walker v. McClellan*, 126 F.3d 127, 130 (2d Cir. 1997) (where inmate plaintiff "refus[ed] to explain the relevance of the requested witnesses' testimony, ... [t]he hearing officer had no obligation to guess at Walker's purpose in calling the witnesses").

**B. Second Claim**

In his second claim, plaintiff alleges that he was not given certain "mental health" medications that he had requested, in violation of his constitutional right to adequate medical care. Dkt. #1-1 at 12-14. He alleges that he submitted these requests to defendant Nurse Osborne, and that she essentially ignored them.

To show that prison medical treatment was so inadequate as to amount to "cruel or unusual punishment" prohibited by the Eighth Amendment, plaintiff must prove that defendants' actions or

- 6 -

omissions amounted to "deliberate indifference to a serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  A medical need is "serious" for constitutional purposes if it presents "'a condition of urgency' that may result in 'degeneration' or 'extreme pain.'"  *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994), *cert. denied*, 513 U.S. 1154 (1995)).  *See also Harrison v. Barkley*, 219 F.3d 132, 136-137 (2d Cir. 2000) ( "A serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain'") (quoting *Chance*, 143 F.3d at 702).

The Supreme Court has explained that the "deliberate indifference" component includes both an objective and a subjective prong.  *See Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991).  With respect to the objective aspect, the court must ask whether there has been a sufficiently serious deprivation of the prisoner's constitutional rights.  With respect to the subjective element, the court must consider whether the deprivation was brought about by defendants in wanton disregard of those rights.  *Id.*  To establish deliberate indifference, then, plaintiff must prove that the defendants had a culpable state of mind and intended wantonly to inflict pain.  *See id.* at 299; *Anderson v. Burge*, 539 F.Supp .2d 684, 687 (W.D.N.Y. 2008).

The Court in *Estelle* also cautioned that mere negligence is not actionable.  A prisoner's complaint that a medical professional "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."  *Estelle*, 429 U.S. at 106.  Rather, the plaintiff must allege conduct that is "repugnant to

the conscience of mankind," *id.* at 102, or "incompatible with the evolving standards of decency that mark the progress of a maturing society," *id.* at 105-06. It is clear, then, that allegations of negligence alone do not state a constitutional claim. *Id.* at 106 n. 14; *Chance*, 143 F.3d at 703-04.

In the case at bar, the record shows that plaintiff put in a request for mental health clinic services on or about December 2, 2004. Dkt. #45-17 ¶ 6; #45-26 at 2. Rosemary Randall, a nurse practitioner who has been employed at the jail since 2001 and who states that she is familiar with plaintiff's medical records and with the care that he received while he was at the jail, states that plaintiff's request was referred to the Steuben County Mental Health Department ("MHD"), pursuant to standard practice at the jail. *Id.* ¶¶ 6-7.

The evidence reflects that the referral to MHD was made on the same day that plaintiff's request was received. Dkt. #45-26 at 2. Randall states, however, that because plaintiff did not appear to be an emergency case and because he made no further requests for mental health services, he was not seen by a psychiatrist from MHD until February 21, 2005. Following that examination, plaintiff was prescribed Prozac. Dkt. #45-17 ¶¶ 8, 9; Dkt. #45-26 at 3.[2]

This evidence does not support plaintiff's Eighth Amendment claim of inadequate medical care. At worst, there was some delay between the time that plaintiff submitted his request slip and the time that he was seen by a medical professional. As the Court of Appeals for the Second Circuit has explained, however, a court faced with a claim alleging delay in treatment should "take into account the severity of the temporary deprivation alleged by the prisoner." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003). It does not appear here that plaintiff suffered any serious adverse

---

[2] Randall also describes other care that plaintiff was given for his diabetes, Dkt. #45-17 ¶¶ 12-22, which is the subject of plaintiffs' sixth claim.

effects as a result of the temporal gap between his request for mental health care in December 2004 and his psychiatric examination in February 2005.

In addition, there is no basis here upon which to find that any of the defendants acted with a culpable state of mind. Plaintiff's request was promptly referred to MHD, and although it took over two months for him to be seen there by a psychiatrist, there was nothing that should reasonably have indicated to defendants that plaintiff had a particularly urgent need for care. The request form indicates that plaintiff stated that he "would like to see some one and get back on [his] meds" because he was "having trouble sleeping and eating and other stuff." Dkt. #45-26 at 2.

In addition, plaintiff testified that after he was prescribed Prozac by the MHD psychiatrist, he continued to receive it throughout his stay at the jail. Tr. at 54-55. Plaintiff therefore cannot show that defendants were deliberately indifferent to his serious medical needs, and accordingly he cannot satisfy the subjective prong of his Eighth Amendment claim. *See Rodriguez v. Ames*, 224 F.Supp.2d 555, 561 (W.D.N.Y. 2002) ("Although a delay in medical care can demonstrate deliberate indifference to a prisoner's medical needs, a prisoner's Eighth Amendment rights are violated only where the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment") (internal quotation marks omitted).

**C. Third Claim**

In his third claim, plaintiff states that he "is challanging [sic] the whole way the Steuben County Jails Process of Grievance is done." Dkt. #1-1 at 15. He alleges that he filed a number of

grievances about various matters at the jail, and that he received responses to almost none of them. These allegations do not support a constitutional claim.

In order to succeed on a § 1983 claim, plaintiff must show that he has been deprived of a constitutional or other federal right. 42 U.S.C. § 1983. It is well established, however, that inmate grievances procedures are undertaken voluntarily by the states, that they are not constitutionally required, and accordingly that a failure to process, investigate or respond to a prisoner's grievances does not in itself give rise to a constitutional claim. *See*, *e.g.*, *Dolberry v. Levine*, 567 F.Supp.2d 413, 416 (W.D.N.Y. 2008); *Conroy v. Avalos*, No. CV08-210, 2008 WL 1989788, at *3 (D.Ariz. May 5, 2008); *Williams v. Scott*, No. 5:07CV0001, 2008 WL 281092, at *3 (E.D.Ark. Jan. 31, 2008); *Smith v. United States*, No. 4:CV-07-1079, 2007 WL 4270602, at *15 (M.D.Pa. Aug. 3, 2007); *Goros v. Pearlman*, No. 9:03CV1303, 2006 WL 839522, at *8-*9 (N.D.N.Y. Mar. 24, 2006). This claim must therefore be dismissed.[3]

**D. Fourth Claim**

In his fourth claim, plaintiff alleges that upon entering custody at the jail, he informed the booking officer that an "enemy" of plaintiff, Frank McCray, was also housed there. Dkt. #1-1 at 18. Apparently McCray's girlfriend was the victim of the crime for which plaintiff had been incarcerated. Tr. at 12.[4]

---

[3]At his deposition in this case, plaintiff testified that he was not alleging that the grievance procedures as set forth in the inmate handbook were inadequate; rather, his claim is that those procedures were not followed at the jail. Tr. at 55-56.

[4]As stated, at the time of the events giving rise to this action, plaintiff was detained
(continued...)

Plaintiff was initially placed in the Special Housing Unit ("SHU") at the jail, but a few days later he was moved to "Quad 1," which was apparently a general-population area within the jail. Plaintiff testified that within a day or two after plaintiff was moved to Quad 1, McCray appeared at his cell door (which was locked) and told plaintiff that McCray "was going to fucking kill me when I come out and he had like three or four other inmates with him." Tr. at 14.

Plaintiff also testified that later that day, as he was returning to his cell from lunch, McCray and some other inmates attempted to intercept him or block his path, but plaintiff was able to run back to his cell and lock the door before they could reach him. He testified that an officer was sitting at a desk nearby in what plaintiff referred to as a "bubble" (presumably meaning that he was behind glass) but that the officer was looking down at his desk and did not see what had happened. *Id.* at 23-25.

That same day, plaintiff submitted a form requesting that he be moved to a different area, away from McCray, for his own protection. Plaintiff testified that "they moved [him back to SHU] within an hour, maybe two hours after that, after they got the slip." *Id.* at 15-16. He stated that he was satisfied with that response. *Id.* at 26.

Another component of this claim concerns plaintiff's allegation that while he was confined in SHU, defendant Deputy Kennedy informed some of the other inmates in SHU of the fact that plaintiff was in the jail because he had been charged with rape. According to plaintiff, two other inmates "confronted" him in the TV room in SHU and told him that they knew that plaintiff was in

---

⁴(...continued)
pending trial. It appears that he had been charged with rape, and that he subsequently pleaded guilty to a charge of attempted rape. Tr. at 12, 28.

jail for "rape 1," and one of the inmates began taunting plaintiff and asking him "how does it feel when she was crying and all this." *Id.* at 34. Plaintiff testified that he then "got up and walked away," went back to his cell, and locked the cell door. *Id.* at 34-35.

Plaintiff also testified that at some point after this occurred, another inmate told him that Kennedy had informed the two inmates about plaintiff's rape charge. *Id.* at 29. Plaintiff stated that on other occasions he had seen Kennedy showing inmates his computer screen, on which Kennedy was pulling up pages with other inmates' photographs, names, criminal history, and other information about the inmates. *Id.* at 31.

Plaintiff testified that when he returned to his cell after the confrontation with the two inmates in the TV room, he "dropped a slip" concerning the incident, and the next morning, he was called out of his cell to speak to defendant Captain Barrett. *Id.* at 35. Barrett allegedly told plaintiff that there was nothing he could do about what Kennedy had done "because it's public information," *i.e.*, the information about plaintiff's rape charge. *Id.* at 36. Barrett did agree, however, to move "the inmate who started it all" (presumably the inmate who had been taunting plaintiff), and he did move that inmate out of SHU. *Id.*

Although plaintiff remained fearful that other inmates might try to harm him because of the nature of the crime with which he had been charged, a sergeant came to plaintiff's cell at some point and told plaintiff that he and some other officers had spoken to the other inmates, that plaintiff "ha[d] nothing to fear," that plaintiff could come out of his cell, and that "nothing [was] going to happen" to him. *Id.* at 37. Plaintiff did come out of his cell after that conversation, and there were no further incidents. *Id.*

The Eighth Amendment imposes a duty on prison officials "to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994)). Prison officials may be held liable under § 1983 for harm suffered by an inmate if the officials acted with "deliberate indifference" to the inmate's safety. *Morales v. New York State Dep't of Corr.*, 842 F.2d 27, 30 (2d Cir. 1988). In order to demonstrate such deliberate indifference, the plaintiff must show that "he is incarcerated under conditions posing a substantial risk of serious harm" and that the prison official had "knowledge that an inmate face[d] a substantial risk of serious harm and he disregard[ed] that risk by failing to take reasonable measures to abate the harm." *Hayes*, 84 F.3d at 620.

Plaintiff has failed to make such a showing here. Even from plaintiff's own allegations and testimony, it is clear that once defendants became aware of a possible risk to plaintiff's safety, they took prompt steps to avoid any problems or future incidents. It is also clear that plaintiff never was harmed, or placed in imminent danger, as a result of anything that defendants did or failed to do. *See Dolberry*, 567 F.Supp.2d at 418 (dismissing failure-to-protect claim where there was no evidence that plaintiff "was subjected to any physical harm, or even a genuine risk of physical harm, as a result of defendants' actions," and "no evidence that defendants acted with deliberate indifference to plaintiff's safety with respect to these matters").

With respect to Kennedy's alleged disclosure to other inmates of the nature of the crime with which plaintiff had been charged, that likewise does not give rise to a cause of action. There is no evidence that Kennedy's alleged disclosure (which has not been established) caused plaintiff to be subjected to any harm, actual or threatened. The disclosure also did not violate any of plaintiff's

- 13 -

privacy rights, since the information in question was not privileged or otherwise protected. *See Paul P. v. Verniero*, 170 F.3d 396, 403 (3d Cir. 1999) ("arrest records and related information are not protected by a right to privacy"); *Cline v. Rogers*, 87 F.3d 176, 179 (6th Cir. 1996) (sheriff's alleged disclosure of plaintiff's arrest record to a third party did not give rise to a federal constitutional claim, "since arrest and conviction information are matters of public record"); *Santiago v. Coughlin*, No. 85 CV 2936, 1990 WL 4741, at *4 (E.D.N.Y. Jan. 17, 1990) (defendant's "alleged disclosure of plaintiff's crime to the inmates is not a violation of his constitutional right to privacy as the information was not confidential").

**E. Fifth Claim**

In his fifth claim, plaintiff alleges that the law library at the jail is inadequate in a number of respects. He alleges, for example, that inmates using the library are not provided with carbon paper (for legal documents) or writing materials, that there are only two typewriters available, and that books are often missing from the shelves. Dkt. #1-1 at 20-21; Tr. at 57-62.

As the Supreme Court of the United States has explained, there is no "abstract, freestanding right to a law library or legal assistance," and "an inmate cannot establish relevant actual injury [to support a § 1983 claim] simply by establishing that his prison's law library ... is subpar in some theoretical sense." *Lewis v. Casey*, 518 U.S. 343, 351 (1996). Rather, an inmate plaintiff alleging the inadequacy of his jail law library must show that the library's deficiencies impeded his "right of access to the courts." *Id.* "Prison law libraries ... are not ends in themselves," then, "but only the

means for ensuring 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'" *Id.* (quoting *Bounds v. Smith*, 430 U.S. 817, 825 (1977)).

To state a claim for denial of access to the courts, "a plaintiff must allege that the defendant took or was responsible for actions that 'hindered [the plaintiff's] efforts to pursue a legal claim.'" *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (quoting *Lewis v. Casey*, 518 U.S. 343, 351 (1996)) (additional internal quotation marks omitted). In other words, the plaintiff must show "actual injury ... such as the dismissal of an otherwise meritorious legal claim." *Id.* (quotation marks omitted). *See also Benjamin v. Fraser*, 264 F.3d 175, 185 (2d Cir. 2001) ("Because law libraries and legal assistance programs do not represent constitutional rights in and of themselves, but only the means to ensure 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts,' prisoners must demonstrate 'actual injury' in order to have standing") (quoting *Lewis*, 518 U.S. at 351).

Plaintiff has not made such a showing here. The complaint does not identify any judicial proceeding that plaintiff was involved in, or attempted or desired to pursue, that was in any way hindered or compromised by the alleged deficiencies in the jail law library. At his deposition, plaintiff testified that he "couldn't even do an Article 78 because they had no information on it. They had no books on it," Tr. at 60, but he did not state why he wanted to file an Article 78 petition or what it would have related to.

When asked how he personally was harmed by the inadequacy of the law library, plaintiff replied that he "couldn't do nothing" on his "rape case because the book wasn't there." He added, "The cases that I did find through other people that was in the jail that was there for rape, I tried to

- 15 -

make a copy of the cases to bring them to my lawyer's attention. I couldn't get a copy. I couldn't get nothing so I would write them down and give them to my attorney and that didn't go nowhere either." *Id.* at 62.

Plaintiff has not demonstrated, however, how this in any way affected the outcome of his criminal case. He apparently did write down the cites of the cases in question (which he has not identified in this action) and was able to pass them on to his lawyer. More to the point, plaintiff did have an attorney in his criminal case, who was presumably aware of the relevant statutory and case law, and it would be wildly speculative to presume that his lawyer would have pursued a different strategy, or given plaintiff different advice, had plaintiff been able to send him copies of cases that plaintiff had run across, or had plaintiff been able to perform his own independent research by using "the book" dealing with rape law.

Furthermore, plaintiff eventually pleaded guilty to attempted rape, which was a lesser charge than the first-degree rape charge that he had been facing. Presumably he admitted the facts supporting the attempted-rape charge during a plea colloquy. Such statements carry a strong presumption of veracity in subsequent proceedings, *United States v. Ross*, 511 F.3d 1233, 1236 (9th Cir. 2008), *Fuller v. Schultz*, ___ F.Supp.2d ___, 2008 WL 3915037, at *11 (S.D.N.Y. Aug. 27, 2008), and the Court will not assume that plaintiff would have gotten a better plea deal, much less that he would have avoided a conviction altogether, had the shelves of the jail law library been better stocked.

Plaintiff also testified that after he "file[d] the '83 [presumably the complaint in this § 1983 action], ... [he] did go to the law library and mysteriously the 1983 books are there. They weren't

there before. There were there before [he] left, but the other stuff is not there." Tr. at 60. It is difficult to decipher from this exactly what he is claiming with respect to the "1983 books" and "the other stuff," but whatever he meant, it certainly does not show that any potentially meritorious claim in this action has been frustrated because of those matters. *See Moore v. Plaster*, 266 F.3d 928, 933 (8th Cir. 2001) (to succeed on an access-to-courts claim, plaintiff must demonstrate that a "nonfrivolous legal claim had been frustrated or was being impeded") (quoting *Lewis*, 518 U.S. at 353), *cert. denied*, 535 U.S. 1037 (2002); *Dolberry*, 567 F.Supp.2d at 419-20 (plaintiff failed to make out § 1983 claim alleging inadequate prison law library where he failed to show "that his pursuit of [any] *non*frivolous lawsuit was impeded by defendants' actions").

Finally, I note that one of plaintiff's complaints about the law library was that inmates were not supplied with writing paper, pens or pencils. His testimony makes clear, however, that he took issue only with the fact that such materials were not supplied *in the library*. He stated, "[t]here's no way to write unless you bring it yourself." Tr. at 57. He conceded, though, that writing materials were available for purchase at the jail commissary, and that he did have money to purchase them. *Id.* at 57, 59. To some extent, he appears to have been attempting to assert claims on behalf of other inmates who could not afford to buy such items.[5] Plaintiff lacks standing, however, to assert such claims on other inmates' behalf. *See Bass v. Singletary*, 143 F.3d 1442, 1446 (11th Cir. 1998) ("Plaintiffs do not have standing to assert other inmates' claims for denial of their rights of access to the courts").

---

[5]Plaintiff also testified that inmates were provided, at no charge, with stationery and a pen for writing letters home. Tr. at 58.

**F. Sixth Claim**

In his sixth and final claim, plaintiff alleges that he did not receive adequate or proper treatment or diet for his diabetes. He states in the complaint that despite his requests, his blood sugar levels were not checked at all from November 28 to December 13, 2004. He also states that because of his condition, he needed to eat more frequently than a nondiabetic person, but that he was only allowed to eat at regular mealtimes, which were at 7:15 a.m., 11:15 a.m., and 4:15 p.m. Dkt. #1-1 at 22.

This claim also fails. First, plaintiff testified that he did make food purchases from the commissary for non-diabetic foods, including candy, peanut butter squares, and carrot cake bars. Tr. at 66. He testified that most of these he used as gambling stakes in poker games with other inmates, although he did eat some of the candy. *Id.*

Plaintiff also testified that the commissary did have some "diabetic stuff" and "a couple of things that were diabetic pertained" available. Tr. at 63-64. That he chose not to avail himself of those items, but instead to purchase sweets, whether to eat or to gamble with, is certainly not attributable to anything that defendants did.

Furthermore, when asked whether he suffered any harm as a result of defendants' alleged denial of "extra" food, plaintiff answered, "Yeah, I was hungry all the time." Tr. at 68. He said that he was unaware of any specific health problems in this regard, and he has never identified any harm that he suffered as a result of the alleged failure to check his blood sugar levels in late 2004.

Plaintiff has thus failed to establish that defendants were deliberately indifferent to his serious medical needs, as explained in Section II(B), *supra*. To make out such a claim, plaintiff must show,

*inter alia*, "that his medical need was 'a condition of urgency, one that may produce death, degeneration, or extreme pain.'" *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005) (quoting *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998)). All that plaintiff has alleged here concerning the alleged denial of snacks is that he was frequently hungry, and he has not alleged any adverse health effects from the failure to monitor his blood sugar levels.

Although there may be cases in which extreme hunger suffices to support an Eighth Amendment claim, this is not such a case. Plaintiff was provided with three meals a day, which he does not claim were inadequate in themselves, as well as an opportunity to purchase food from the commissary, which he did, often choosing to buy sweets to use as gambling stakes in poker games. Plaintiff also testified that he "might have" gained weight while at the jail. Tr. at 67. That evidence is insufficient to give rise to any issues of material fact with respect to plaintiff's sixth claim concerning his diabetes. *See Berry v. Brady*, 192 F.3d 504, 508 (5th Cir. 1999) (plaintiff who alleged that defendants refused to permit him admittance to prison dining hall for the evening meal on eight occasions over a seven-month span, because on each occasion plaintiff, in violation of prison regulations, had refused to shave, failed to state Eighth Amendment claim, because plaintiff had not alleged: "any specific physical harm, other than hunger pains"; "that he lost weight or suffered other adverse physical effects or was denied a nutritionally and calorically adequate diet"; or that his health was put at risk as a result of defendants' actions).

**III. Qualified Immunity**

Even if a violation of plaintiff's rights could be found, defendants would be entitled to qualified immunity from liability for their actions. Qualified immunity shields public officials "from civil damages liability insofar as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known,' or insofar as 'it [is] objectively reasonable for them to believe that their acts d[o] not violate those rights.'" *Simms v. Village of Albion*, 115 F.3d 1098,1106 (2d Cir.1997) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), and *Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994)); *accord Brown v. City of Oneonta*, 106 F.3d 1125,1130-31 (2d Cir. 1997). For the reasons given, I find that plaintiff's constitutional rights were not violated at all; it was therefore objectively reasonable for defendants to believe that their actions did not violate plaintiff's constitutional rights. *See Green v. McGinnis*, 515 F.Supp.2d 379, 384 (W.D.N.Y. 2007).

**CONCLUSION**

Defendants' motion for summary judgment (Dkt. #45) is granted, and the complaint is dismissed.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       October 17, 2008.